UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


| | | |
|---|---|---|
| JACQUELINE HAMILTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:11CV713 RWS |
| | ) | (TIA) |
| MICHAEL ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This cause is on appeal from an adverse ruling of the Social Security Administration.

The suit involves applications for Disability Insurance Benefits under Title II of the Social

Security Act and Supplemental Security Income under Title XVI of the Act. Claimant has filed a

Brief in Support of his Complaint; the Commissioner has filed a Brief in Support of his Answer.

The action was referred to the undersigned United States Magistrate Judge under 28 U.S.C. §

636(b) for recommended disposition. For the reasons set forth below, the undersigned

recommends that the decision of the Commissioner be affirmed.

**I.      Procedural History**

On June 23, 2008, Claimant filed Applications for Supplemental Security Income

payments pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et. seq. (Tr. 132-

35) and for Disability Insurance Benefits under Title II of the Act, 42 U.S.C. §§ 401 et. seq. (Tr.

127-31)[1] alleging disability since August 16, 2007 due to multiple sclerosis, extreme fatigue, and

---

[1]"Tr." refers to the page of the administrative record filed by Defendant with its Answer.
(Docket No. 10/filed July 5, 2011).

pain in her arms. (Tr. 155). The applications were denied (Tr. 75-77, 81-85), and Claimant subsequently requested a hearing before an Administrative Law Judge ("ALJ"). On December 16, 2009, a hearing was held before an ALJ. (Tr. 24-74). Claimant testified and was represented by counsel. (Id.). Vocational Expert Delores Elvira Gonzalez also testified at the hearing. (Tr. 66-71, 123-26). In a decision dated April 16, 2010, the ALJ found that Claimant had not been under a disability as defined by the Social Security Act. (Tr. 7-19). The Appeals Council denied Claimant's Request for Review on March 18, 2011. (Tr. 1-3). Thus, the ALJ's decision is the final decision of the Commissioner.

## II.  Evidence Before the ALJ

### A.  Hearing on December 16, 2009

#### 1.  Claimant's Testimony

At the hearing on December 16, 2009, Claimant testified in response to questions posed by the ALJ and counsel. (Tr. 24-65). Claimant has two daughters, ages 21 and 29 and four grandchildren, ages 2, 3, 7, and 11. (Tr. 30). Claimant's date of birth is November19, 1962. At the time of the hearing, Claimant was forty-seven years of age. (Tr. 30). Claimant testified that she lives in an apartment on the first floor in a complex with her daughter, sister and three-year old grandson and has never been married. (Tr. 30-31, 48). Claimant completed two years of college. (Tr. 31). Claimant left high school because of pregnancy and earned her GED. (Tr. 32). Claimant is right-handed. Claimant stands at five feet five inches and weighs 159 pounds. Claimant testified that she can read newspapers, books, magazines and the Bible. (Tr. 32). Claimant testified that she receives long term disability benefits in the amount of $1,174.00 from her job. (Tr. 33). Claimant is on Spend-Down and last worked in December 2005. (Tr. 34).

When asked about her wages in the amount of $4,715 in 2006, Claimant explained the wages were from insurance short term disability. (Tr. 34-35).

Claimant stopped working in 2005 after having problems with her charge nurse due to her fatigue and taking too many breaks. (Tr. 58-59). After taking the Valium stress test, Claimant was diagnosed with multiple sclerosis. (Tr. 59). Claimant continued working until one day she had to leave work, because she was hurting. Claimant talked to her boss about whether Claimant could do her job, because she would call in sick and so her hours were cut. (Tr. 59). Claimant reported that she missed more work days than she worked. (Tr. 59-60).

Claimant testified that she worked as a nurse assistant for St. Joseph Hospital in Kirkwood for three years. (Tr. 35). Thereafter, Claimant worked at Sisterly Care In-Home Service doing some at home work and some work in the facility. (Tr. 35). Claimant then worked as a pediatric physical therapist taking care of cerebral palsy children of various ages. (Tr. 36). Claimant also worked for ATC Healthcare Services being sent out to different hospitals and at Tender Hospital East. (Tr. 36). Claimant worked for the State of Missouri working for the Missouri Vets Home in 1997. (Tr. 37-38). For the last fifteen years, Claimant only completed CNA work. (Tr. 38).

Claimant testified that she was diagnosed with multiple sclerosis in February 2005, and she has daily injections as treatment. (Tr. 39). Claimant takes Cymbalta as treatment for her depression as prescribed by a psychiatrist, her primary care doctor. (Tr. 40). Claimant testified that she has also been diagnosed with anxiety and panic attacks. (Tr. 41). Claimant's anxiety causes her heart to race. Because of her panic attacks, Claimant does not like to go anywhere for fear she will have a panic attack. (Tr. 41). Claimant testified that she does not call for ambulances as often in the past for her racing heart problems. (Tr. 42-43). Claimant used to call

for ambulances three to four times a week and would usually go to the hospital for treatment of her heart. (Tr. 42). Sometimes taking Xanax would cause her to calm down. (Tr. 42). Claimant last called an ambulance on December 3 after going to a friend's house and her heart started racing. (Tr. 43).

Claimant testified that she has back problems every day from the bulges in her discs, but the doctor recommended physical therapy exercises as treatment, not surgery. (Tr. 44-45). Claimant testified that sometimes she would do the exercises, but other times she did not feel like doing the exercises. (Tr. 45). Sitting causes Claimant the most problems with her back on her left side. After having relapse of multiple sclerosis in 2007, Claimant testified that she has problems with her left leg and with walking. (Tr. 45, 48). Claimant testified that taking carbamazepine helps the burning sensation. (Tr. 46). Claimant takes tramadol every four to six hours for pain. Claimant testified that she does not want surgery nor has surgery been recommended as treatment. (Tr. 46). Claimant testified that she only has problems with her back when she sits or stands for a prolonged period. (Tr. 47).

Side effects from her medications include swelling at her injection sites and redness. (Tr. 48). Claimant testified that she experiences fatigue from medications and her multiple sclerosis. (Tr. 48). After having the relapse, Claimant was hospitalized , and was fitted with a foot brace. (Tr. 60). Claimant started therapy as treatment for her dropped foot, and Claimant testified her condition improved with therapy. Claimant testified her therapy included walking on a treadmill, going up and down steps, and doing home exercises. (Tr. 60).

Claimant's mother passed away in 2007, and she sought treatment at Christian Hospital Northeast for a grief reaction. (Tr. 44).

With respect to her daily activities, Claimant testified that she can cook regular meals. (Tr. 51). Claimant sometimes does the dishes by hand. (Tr. 52). Claimant cannot vacuum, because she tires too quickly. (Tr. 52). Claimant testified that she can take care of one or two grandchildren at a time, but she does not spend the amount of time with her grandchildren like she should. (Tr. 49). Claimant helps take care of her youngest daughter's son financially. (Tr. 50). Claimant testified that she sometimes babysits her grandson if her daughter needs to go somewhere, but she does not watch him on a regular basis. (Tr. 50-51). Claimant goes with her daughter to the Laundromat to do the wash. (Tr. 53). Claimant testified that she stopped doing laundry without help after she had her relapse in June 2007. (Tr. 54). When the ALJ asked Claimant about listing doing laundry and cleaning in a form dated July 28, 2008, Claimant noted she assists with the laundry by going with her daughter to the Laundromat and putting the washing powder in the machine and folding clothes. (Tr. 54-55). Either Claimant's sister or daughter takes her to the grocery store. (Tr. 64-65). Claimant testified that she does not go alone, because she does not drive because of leg spasms and panic attacks. (Tr. 65). Claimant gave her computer to her nephew, because she was not using the computer. Claimant testified that she can use the computer for a certain length of time, but then her fingers become numb and tingling. (Tr. 65).

Claimant testified that her doctor thinks it is good for her to walk. (Tr. 55). Claimant testified that she can walk for twenty minutes, but her doctor wants her to walk for thirty minutes. (Tr. 56). Claimant can stand but has problems keeping her balance, and her gait is getting bad.

Claimant testified that she can sit for thirty minutes, and lifting a gallon of tea hurts her arm. (Tr. 56). After the ALJ noted that Claimant stood up at the hearing and held onto the chair, Claimant testified that she could stand up but uncertain for how long. (Tr. 61). Claimant testified that she is trying to quit smoking, but she smokes less than a pack of cigarettes each day. (Tr. 57). Claimant testified she smokes marijuana every now and then. (Tr. 57). Claimant testified that the doctor knows she smokes marijuana to help her relax. (Tr. 58).

Claimant testified that she stopped taking Rebif and getting injections three times a week about three to five months ago. (Tr. 62). Claimant stopped the Rebif, because her body had built a resistance to it, and she started taking copaxone as a daily injection. (Tr. 62). When the ALJ asked about Claimant crying during the hearing, Claimant explained that while sitting at home, she starts crying when she thinks about her situation or her mother. (Tr. 62-63). Claimant testified that she has crying spells all the time. (Tr. 63). Claimant testified that taking a Xanax when she experiences a panic attack helps slow down her heart rate within twenty to thirty minutes. (Tr. 63-64). Claimant testified that she has problems sleeping at night unless she takes medication, but then she feels groggy the next day. (Tr. 64).

### 2. Testimony of Vocational Expert

Vocational Expert Delores Elvira Gonzalez, a vocational rehabilitation counselor, testified in response to the ALJ's questions. (Tr. 66-71). Ms. Gonzalez identified the St. Louis metropolitan area as the specific region of the country that she would reference concerning the existence and number of jobs. (Tr. 68). Claimant identified the following jobs including the skills and exertional categories at which Claimant performed the jobs or which the jobs are generally performed in the national economy as Claimant's vocational history over the past fifteen years:

certified nurse assistant, 355.674-014, classified as medium semiskilled work and home health aid, classified as medium semiskilled work, both jobs could require a person to transfer and be in the heavy range at times. Ms. Gonzalez noted that Claimant has not acquired any skills which could be utilized in other jobs. (Tr. 68).

The ALJ asked Ms. Gonzalez to assume

a hypothetical individual with the claimant's education training and work experience at the time of AOD. Further assume the individual can perform light work with the following limitations. Climb stairs and ramps occasionally, never climb ropes, ladders, or scaffolds. Stoop, kneel, crouch occasionally, never crawl. This individual can understand, remember, and carry out at least simple instructions nondetailed tasks, demonstrate adequate judgment to make simple work related decisions, perform repetitive work according to set procedures, sequence, or pace. Should not work in a setting which includes constant regular contact with the general public. Are there any jobs this individual could do?

(Tr. 68-69). Ms. Gonzalez opined that the hypothetical individual could work as a hand presser, 363.684-018, classified as light unskilled job with 75,150 jobs nationally, 970 in Missouri, and 580 in the St. Louis metropolitan area; a bench assembler, 706.684-042, classified as light unskilled job with 75,150 jobs nationally, 970 in Missouri, and 580 in the St. Louis metropolitan area; a bench assembler, 706.684--042, classified as light unskilled job with 288,470 jobs nationally, 6,320 in Missouri, and 2,990 in the St. Louis metropolitan area; and cleaner, 323.687-014, classified as light unskilled job with 917,120 jobs nationally, 22,800 in Missouri, and 9,970 in the St. Louis metropolitan area. (Tr. 69).

Next, the ALJ asked Ms. Gonzalez to assume

light work, same exertional limitations but the change in the mental limitations, this individual could understand, remember, carry out at lease simple instructions nondetailed tasks, maintain concentration and attention for 2-hour segments over an 8-hour period, respond appropriately to supervisors and coworkers in a task

oriented setting where contact with others is casual and infrequent. Would that impact the jobs you gave me for hypothetical 1?

(Tr. 69-70). Ms. Gonzalez responded no. (Tr. 70).

Next, the ALJ asked Ms. Gonzalez to drop to sedentary exertional level with everything else remaining the same from the last hypothetical, (Tr. 70). Ms. Gonzalez noted that all of the jobs she previously identified were the light exertional level. Ms. Gonzalez opined that such hypothetical individual would be able to perform the following jobs: an addresser, 209.587-010, classified as sedentary unskilled job with 153,530 jobs nationally, 4,100 in Missouri, and 1,260 in the St. Louis metropolitan area; and a sticker, 734.687-090, classified as a sedentary unskilled job with 280, 160 jobs nationally, 6,320 in Missouri, and 2,990 in the St. Louis metropolitan area. (Tr. 70).

Last, the ALJ asked Ms. Gonzalez to assume the same facts in hypothetical three but because of fatigue, the individual must have two additional breaks beyond the normal two breaks and lunch. (Tr. 70). Further, the ALJ added that the individual "could have crying spells daily which could impact not only her staying on task but other workers, so they were significant enough that they would disturb other workers." (Tr. 70-71). Ms. Gonzalez opined that such hypothetical individual would not be able to perform the jobs listed for hypothetical 3 or any other competitive employment. (Tr. 71).

Claimant's counsel asked Ms. Gonzalez to consider Dr. Sommerville's assessment wherein he determined "claimant could sit four hours, stand one hour, and walk one hour, so we have a total of 6 hours." (Tr. 71). Counsel asked if there was any competitive employment

- 8 -

available to a claimant if the claimant can only do work for 6 hours. Ms. Gonzalez responded no and explained that a person needs to be able to work for at least 8 hours a day. (Tr. 71).

### 3. Open Record

A review of the record shows that counsel submitted the additional medical records as requested by counsel to the ALJ before he issued a decision denying Claimant's claims for benefits. (Tr. 29, 769-955).

### 4. Forms Completed by Claimant

In the Disability Report - Adult completed on May 15, 2008, Claimant reported being able to lift a gallon of milk but the lifting causes her pain. (Tr. 154-55). Claimant wears ankle braces to help her walk and to compensate for the weakness in her legs. (Tr. 155). Claimant reported not being able to sit for more than 30 minutes due to pain in her waist and legs. Claimant reported problems with her memory, concentration, and focus due to lesions on her brain. Due to her extreme fatigue, Claimant must lie down during the day and takes medication to sleep at night. Claimant reported last working on December 2, 2005, and she became unable to work because of her conditions on August 16, 2007. (Tr. 155). Claimant reported not seeing a doctor for emotional or mental problems that limit her ability to work. (Tr. 157).

In the Function Report Adult - Third Party completed on July 28, 2008, Claimant's brother reported that she lives in a house with friends, and he sees Claimant two to three times a week to run errands. (Tr. 162). He reported that Claimant takes care of her youngest daughter. (Tr. 163). He reported that Claimant prepares meals daily and does laundry and cleaning. (Tr. 164). He reported that Claimant goes shopping for food once a week for a couple of hours. (Tr. 165).

In the Function Report - Adult dated July 28, 2008, Claimant reported living in a house with friends. (Tr. 171). Claimant tries to walk if the weather permits. (Tr. 171). Claimant reported preparing meals daily and being able to clean and do the laundry with her daughter's assistance. (Tr. 173). Claimant reported her social activities include going to her sister's house, going to church, and going grocery shopping twice a month. (Tr. 175).

## III.    Medical Records

In the initial visit on July 28, 2006, Claimant reported having multiple sclerosis and leg problems and taking Rebif injections as treatment. (Tr. 354). Claimant reported weakness, tiring easily, numbness, and anxiety attacks. (Tr. 358). Claimant would be losing her long term disability benefits soon. (Tr. 354). Claimant reported smoking one package of cigarettes a day and having an associate's degree. (Tr. 355). Dr. Sommerville prescribed Rebif injections three times a week as treatment. (Tr. 354).

On August 10, 2006, Claimant complained of rash on right arm. (Tr. 273, 281). Dr. Ahmad, a psychiatrist, noted Claimant has been diagnosed with multiple sclerosis and anxiety. Dr. Ahmad prescribed Wellbutrin. (Tr. 273, 281). Claimant returned on August 31, 2006 and reported having panic attacks. (Tr. 274, 280).

On August 11, 2006, Dr. Sommerville restarted Claimant on Rebif. (Tr. 349, 413). Dr. Sommerville diagnosed Claimant with multiple sclerosis, panic attacks, and depression. (Tr. 350, 414).

In the November 10, 2006 Supplemental Attending Physician Statement, Dr. Sommerville noted that Claimant stopped working in 2005 because of her condition, but he did not advise her to cease working. (Tr. 726). Dr. Sommerville listed hyperflexia of Claimant's right leg as his

objective findings and indicated that Claimant had not been hospitalized. (Tr. 726). Dr. Sommerville opined that Claimant could sit for four hours and stand and walk for an hour in an eight hour workday. (Tr. 727). Dr. Sommerville further opined that Claimant could frequently perform fine finger movements, hand-eye coordinated movements, and pushing/pulling. Dr. Sommerville noted that he expected improvement in Claimant's capabilities in three to six months, and Claimant had no restrictions on activities or limitations on activities. (Tr. 727).

In the Department of Neurology Progress Note dated November 10, 2006, Dr. Sommerville noted Claimant to be on disability. (Tr. 346, 410). Claimant reported having trouble lifting groceries, not feeling right, and stumbling constantly. Claimant reported being able to enjoy some activities such as the casino boat. (Tr.346, 410).

In the follow-up visit for treatment of her multiple sclerosis on December 6, 2006, Claimant reported doing relatively well and her mood improving since her last visit. (Tr. 337). Dr. Sommerville observed Claimant's gait and stance to be normal, and Claimant able to walk on her heels and her toes. (Tr. 338). Dr. Sommerville noted that Claimant's disease appeared to be stable on Rebif. (Tr. 338).

The December 22, 2006 MRI of Claimant's brain showed T2 FLAIR lesions in the subcortical white matter of the left hemisphere with abnormal hyperintense T2 signal in the left side of the spinal cord extending from C2 to C5 consistent with Claimant's diagnosis of multiple sclerosis. (Tr. 340-41, 404-05). The MRI of Claimant's cervical spine showed mild degenerative disc disease of the cervical spine. (Tr. 340-41, 406-07). Claimant reported doing relatively well in the follow-up appointment, and her mood improving since the last visit. (Tr. 401). Dr. Sommerville observed Claimant's gait and stance to be normal and Claimant able to walk on her

heels and her toes. (Tr. 402).

On January 12, 2007, Claimant called Dr. Ahmad's office requesting a medication refill. (Tr. 274, 280, 772). Claimant missed her last scheduled appointment on September 21, 2006. Dr. Ahmad refilled her medications for one week. (Tr. 274, 280, 772). In a follow-up appointment, Claimant reported feeling tired and taking Cymbalta. (Tr. 275).

On February 8, 2007, Claimant received treatment in the emergency room at Depaul Health Center. (Tr. 521). In the discharge instructions, the doctor indicated that Claimant could do activities as tolerated and could drive. (Tr. 522). The chest x-ray showed normal results. (Tr. 532).

On February 17, 2007, Claimant received emergency room treatment for chest pain at Christian Hospital Northeast. (Tr. 590, 890). Claimant reported mild chest pain starting two hours earlier but the pain had improved. Claimant was placed on a cardiac monitor. (Tr. 590, 890). Claimant received IV fluids and oxygen. (Tr. 592, 892). Although the treating doctor wanted to give Claimant an Ativan injection, Claimant refused the injection. (Tr. 593, 893). Claimant reported having similar symptoms previously. (Tr. 594, 894). Claimant's diagnosis included palpitations and chest pain - atypical. (Tr. 601, 902). The chest x-ray showed no active disease. (Tr. 612, 916).

In a follow-up visit for treatment of multiple sclerosis and pain on April 16, 2007, Dr. Sommerville noted Claimant to have minimal disability but significant neuropathic pain. (Tr. 785). Dr. Sommerville opined '[b]y clinical and imaging criteria her disease has been stable on Rebif for over one year." Dr. Sommerville noted that Claimant has been worked up for cardiac issues in the past, but her work ups have been unremarkable though she calls 911 frequently for

this complaint. (Tr. 785). Dr. Sommerville noted examination to be normal and unchanged although Claimant experienced worsening of her paresthesias following self-discontinuation of amityriptyline. (Tr. 786). Dr. Sommerville continued Claimant's Rebif dose noting Claimant felt better on that dosage. (Tr. 786).

On April 28, 2007, Claimant received emergency room treatment for anxiety at Christian Hospital Northeast. (Tr. 613). Claimant was given Xanax and an IV as treatment. (Tr. 616). Examination showed symptoms, heart racing, to have improved. (Tr. 617). Claimant reported smoking one package of cigarettes a day. (Tr. 617). Cardiac examination showed no murmurs or gallops. (Tr. 618). The treating doctor diagnosed Claimant with palpitations and anxiety. (Tr. 623).

Claimant reported seeking treatment in the emergency room for panic attacks during an office visit with Dr. Ahmad on May 10, 2007. (Tr. 270, 282). Dr. Ahmad prescribed Cymbalta. (Tr. 270). In a follow-up visit on August 23, 2007, Claimant reported the prescription cream not resolving her rash and requested a prescription for Xanax. (Tr. 271).

In the Barnes-Jewish Neuro/Neurosurgery Clinic Note dated May 25, 2007, Claimant reported developing some weakness in her left leg about one month earlier. (Tr. 334, 398). Claimant contacted the doctor one week earlier reporting her systems and elected to wait until her scheduled appointment to be seen. (Tr. 334, 398). Dr. Sommerville observed Claimant's gait to be notable for left foot drop. (Tr. 335, 399). Dr. Sommerville found Claimant to be experiencing a multiple sclerosis exacerbation likely localizing to the thoracic cord on her left side and noted due social issues involving her family, Claimant preferred to manage this on an outpatient basis. Dr. Sommerville gave Claimant a prescription for dexamethasone taper. (Tr. 335, 399).

On May 27, 2007, Claimant sought treatment in the emergency room at Barnes-Jewish Hospital complaining of weakness to her left leg. (Tr. 323, 387, 671). Claimant reported starting on decadron on May 25, and Dr. Sommerville had wanted her admitted to the hospital, but Claimant had family issues. (Tr. 323, 387). Claimant reported living with her daughter and taking care of her mother who has severe lupus. (Tr. 672). Claimant reported smoking marijuana three to four times a week. The treating doctor noted that Claimant was able to follow complicated commands without any trouble. (Tr. 672). The doctor noted that Claimant had some trouble with tandem gait primarily due to the weakness in her left leg. (Tr. 673). Claimant reported having a panic attack with palpitations the night before and taking Xanax to relieve her symptoms. (Tr. 325, 389). The nurse placed a cardiac monitor on Claimant. Dr. Douglas Char noted that Claimant had been treated by Dr. Sommerville "last Friday and evaluation was consistent with exacerbation of MS; initial plan to admit the patient, but given family problems pt decided to go home and was prescribed 25 mg decadron q day however prescription was just filled today." (Tr. 325, 389). Cardiac examination showed regular heart rate and rhythm. (Tr. 327, 391). Dr. Char recommended Claimant be admitted to neurology service and noted that Claimant refused admission earlier due to family difficulties and noted how Claimant failed to start prescribed dexamethasone. (Tr. 327, 391). Treatment included intravenous Solu-Medrol, and if her symptoms improved, Claimant would be discharged. (Tr. 673). In the Discharge Summary, multiple sclerosis is listed as her primary diagnosis. (Tr. 674). After receiving the increased dosage of the intravenous Solu-Medrol, Claimant noted significant relief in the left lower extremity and complete resolution of the burning sensation in her left torso. The doctor observed Claimant able to walk without any significant difficulty. (Tr. 674).

On June 15, 2007, Claimant was fitted with an orthotic for her leg for her dropped foot. (Tr. 793-94, 798).

On June 22, 2007, Dr. Sommerville noted Claimant to have a recent admission for exacerbation of multiple sclerosis. (Tr. 318, 382, 782). Claimant reported improvement in her walking and using the exercise bike. (Tr. 318, 382, 782). Dr. Sommerville noted Claimant had improved considerably since the last visit in terms of her strength, and she no longer needs foot brace. (Tr. 319, 383, 783). Dr. Sommerville continued her Rebif for disease modification and reminded Claimant to remain well hydrated during summer months. Dr. Sommerville noted Claimant's pain to be reasonably well controlled on carbamazepine. (Tr. 319, 383, 783).

On June 30, 2007, Claimant sought treatment in the emergency room at Northwest Healthcare, but she left without receiving treatment. (Tr. 633-34, 869).

On July 27, 2007, Dr. Sommerville noted that he did not think Claimant's daytime fatigue was caused by medications but due to a combination of multiple sclerosis, depression, and poor sleep. (Tr. 315, 379, 695). Claimant reported doing well overall with minimal disability. Claimant reported having continued persistent pain, but overall she is much improved by taking carbamazepine. (Tr. 315, 379, 695). Dr. Sommerville noted Claimant's pain to be well controlled. (Tr. 316, 380, 696).

Claimant returned for follow-up treatment on August 10, 2007, and Claimant reported doing well overall with minimal disability. (Tr. 315). Claimant complained of persistent pain in left flank but the pain overall to be much improved at the present time and controlled by carbamazepine. (Tr. 315). Dr. Sommerville observed Claimant to have a normal gait and noted her pain to be well controlled. (Tr. 316).

In the emergency department summary of August 17, 2007, Claimant denied any anxiety. (Tr. 210-12). Examination showed normal range of motion in all four extremities. (Tr. 814).

Claimant reported chest pain and pain down left arm on September 18, 2007 in the emergency room at Christian Hospital Northeast. (Tr. 234, 635, 834). Claimant was placed on cardiac monitor. (Tr. 235, 636, 835). After an EKG was completed, Dr. James Nahlik started an IV. (Tr. 237, 638, 836). Cardiac review showed the heart to have regular rate and rhythm. (Tr. 245, 643, 845). Claimant's diagnosis included hypokalemia, chest pain - non cardiac, and multiple sclerosis. (Tr. 252, 254, 653, 655, 852). In the Emergency Department Summary, Claimant was apprised that she should eat a banana or drink orange juice every day to help her low potassium. (Tr. 258, 659, 858). The doctor noted that some symptoms of low potassium include fatigue, weakness, and muscle cramping. (Tr. 258, 858). The chest radiography showed unremarkable examination. (Tr. 266, 660, 866).

In a follow-up visit on October 11, 2007, Claimant reported a rash on both arms and left sided weakness. (Tr. 272, 284, 706). Examination showed Claimant's gait to be steady and inability to stand on left foot. (Tr. 272, 284, 706).

On October 15, 2007, Claimant received treatment at Christian Northeast/Northwest Hospital and listed her occupation as disabled. (Tr. 202). Claimant listed Medicaid as her primary insurance. (Tr. 203). Based on the MRI imaging of Claimant's brain, the doctor noted that the findings are consistent with the diagnosis of multiple sclerosis with relative small lesion load. (Tr. 205-06). Listed in Claimant's history is multiple sclerosis and left-sided weakness. (Tr. 206). The MRI of Claimant's brain showed the findings to be consistent with the diagnosis of multiple sclerosis with relative small lesion load. (Tr. 806).

On October 25, 2007, Claimant received treatment in the emergency room at Christian Northeast/Northwest Hospital and listed Medicaid Missouri as her primary insurance. (Tr. 445-46).

On November 9, 2007, Claimant returned for routine follow-up of relapsing-remitting multiple sclerosis. (Tr. 312, 376, 690). Dr. Sommerville noted Claimant had generally been doing well, but she had recently had a return of her dysesthesias affecting predominantly the left side of her body and back of the head. Claimant cut back on her carbamazepine due to daytime fatigue. Dr. Sommerville explained to Claimant that her worsening pain symptoms might be related to her cutting back on the carbamazepine medication. Dr. Sommerville noted Claimant had previously had problems with chest symptoms resulting in many emergency visits to outside hospitals. (Tr. 312, 376, 690). The cardiovascular examination showed regular rate and rhythm and no murmurs. (Tr. 313, 377, 691). Dr. Sommerville opined that there was no evidence of ongoing multiple sclerosis exacerbation based on the unchanged neurological examination and restriction of her chronic symptoms to the sensory domain. (Tr. 314, 378,691).

On December 13, 2007, Claimant reported feeling pressure in her chest and the pain being non-radiating in the emergency room at Christian Hospital Northeast. (Tr. 447). Claimant was placed on a cardiac monitor. (Tr. 448). Claimant's mother passed that morning. (Tr. 449, 451). After her mother's passing, Claimant reported experiencing fluttering in her chest with heaviness. (Tr. 457). Claimant reported smoking one-half a package of cigarettes for twenty-seven years. (Tr. 458). After treatment, Claimant reported feeling better and wanting to go home. (Tr. 459). Claimant was diagnosed with grief reaction, anxiety, and gastroesophageal reflux disorder. (Tr. 464). The cardiac monitor interpretation showed Claimant to have a normal rate. (Tr. 464).

In a follow-up visit on January 11, 2008, Claimant reported doing generally well, but she continues to have mild dysesthesias affecting predominantly her left side of her body. (Tr. 307, 371). Dr. Sommerville noted Claimant was not having problems with weakness or gait. Claimant reported having some fatigue and difficulty concentrating. (Tr. 307, 371, 684). The radiology report of January 2008 showed approximately 10 hyperintense T2 FLAIR lesions in the subcortical white matter of the left cerebral hemisphere with abnormal hyperintense T2 signal in the left side of the spinal cord extending from C2 to C5 consistent with her diagnosis of multiple sclerosis, and mild degenerative disc disease of the cervical spine. (Tr. 308-09, 372-73, 685). Dr. Sommerville found no evidence of ongoing multiple sclerosis exacerbation based on the unchanged neurological examination and restriction of her chronic symptoms to her sensory domain. (Tr. 311, 375, 686). Dr. Sommerville continued the Rebif injections to prevent multiple sclerosis relapses. (Tr. 311, 375, 686).

Claimant failed to keep her scheduled appointment on January 14, 2008. (Tr. 275, 285).

In follow-up treatment on February 11, 2008, Dr. Sommerville found no evidence of ongoing multiple sclerosis exacerbation based on the unchanged neurological examination and restriction of her chronic symptoms to the sensory domain. (Tr. 311). Dr. Sommerville continued Rebif medication for prevention of multiple sclerosis relapses. Dr. Sommerville continued carbamazepine and Ultram medications for symptomatic relief of her dysesthesias. (Tr. 311).

On March 20, 2008, Claimant reported being dizzy during an office visit and having fast palpations during anxiety attacks. (Tr. 276,286). Claimant requested Xanax. (Tr. 276, 286).

On April 25, 2008, Claimant returned for follow-up treatment of her relapsing-remitting

multiple sclerosis. (Tr. 304, 368). Dr. Sommerville noted that "[d]ue to a complex problem with her Medicaid spenddown, she had to stop taking carbamazepine over the past month, which she takes for control of her neuropathic pain ... and has consequently experienced a return of her otherwise typical pain in the left arm and neck region." (Tr. 304, 368). Claimant reported a tendency of her left ankle to avulse laterally while walking causing her to fall one month earlier. Claimant noted she might be pregnant due to a recent condom failure with boyfriend. Claimant is attempting to stop smoking. (Tr. 304, 368). Dr. Sommerville observed her gait to be normal and heel-knee-shin movement is slowed to the left. (Tr. 305, 369). Dr. Sommerville opined that he did not believe Claimant to be undergoing a true multiple sclerosis exacerbation inasmuch as her documented weakness in her left leg is probably baseline. Dr. Sommerville continued Claimant's Rebif regimen. (Tr. 305, 369). Dr. Sommerville also suggested Claimant obtain an ankle wrap/ACE bandage to provide modest structural support for her left ankle and to prevent further falls. (Tr. 306, 370).

On June 6, 2008, Claimant reported having multiple medical complaints in the emergency room at Northwest Healthcare. (Tr. 481). Claimant reported having multiple sclerosis and thinking she is going through menopause. (Tr. 481). Claimant left without treatment. (Tr. 484). The record indicates that Claimant came to the nursing desk speaking on a cell phone and stated that she was leaving and refused to sign AMA form. (Tr. 484).

In the Neuro/Neurosurgery Clinic Noted of August 8, 2008, Claimant returned for treatment of her multiple sclerosis and reported not being able to refill the carbamazepine until September 1 due to Medicaid spenddown issues. (Tr. 298, 362). Claimant reported experiencing painful spasms affecting her left side and intense, short-lived knee pain and stiffness in the

morning. Claimant is applying for Medicare and reports lots of fatigue. Claimant is attempting to quit smoking. (Tr. 298, 362). Dr. Sommerville observed Claimant to have a normal gait. (Tr. 299, 363). Dr. Sommerville attributed Claimant's fatigue as being a symptom of multiple sclerosis and depression. Dr. Sommerville encouraged Claimant to exercise on a regular basis, maintain a good sleep schedule, and good nutrition to help control her fatigue. Dr. Sommerville noted that Claimant has a psychiatrist who is managing her depression. (Tr. 299).

On October 15, 2008, Claimant received treatment in the emergency room at Northwest Healthcare for congestion and pain in her right ear. (Tr. 487). The treating doctor diagnosed Claimant with acute otitis extreme. (Tr. 490, 495).

In the Psychiatric Review Technique dated October 29, 2008, Dr. Robert Cottone, Ph.D., found Claimant to have affective disorders, a major depressive disorder, and a generalized anxiety-related disorders but her impairment not to be severe and not expected to last twelve months. (Tr. 429, 432-3). Dr. Cottone found Claimant's functional limitations to be moderate in restrictions of activities of daily living, difficulties in maintaining social functioning and concentration, persistence, or pace. (Tr. 437). Dr. Cottone noted Claimant would have one or two episodes of decompensation. (Tr. 437). In support, Dr. Cottone noted Claimant is able to clean and help daughter with laundry. (Tr. 439). Claimant reported difficulty with lifting, squatting, understanding, walking, sitting, memory, concentration, understanding, and following instructions. Dr. Cottone opined that Claimant's mental health issues are related to her physical impairment. Dr. Cottone noted that Claimant does not allege psychological condition in her application and has been treated by Dr. Ahmed who diagnosed Claimant's depression on August 10, 2006 and prescribed Wellbutrin and Xanax. On October 11, 2007, Claimant reported that her

mental health was excellent prior to her multiple sclerosis diagnosis.  (Tr. 439).  Dr. Cottone

noted that the first evidence of psychiatric severity occurred during the consultative examination

and before that time, Claimant had complaints of anxiety and depression but without severity.

(Tr. 439).  Dr. Cottone opined that "[a]ltough her condition is associated with her MS, they are

highly treatable mental disorders, especially with a combination of medication and

psychotherapy."  (Tr. 440).

      In the Mental Residual Functional Capacity Assessment, Dr. Cottone found Claimant to be

moderately limited in her ability to understand and remember detailed instructions.  (Tr. 441).

With respect to sustained concentration and persistence, Dr. Cottone found Claimant to be

moderately limited in her ability to carry out detailed instructions, to maintain attention and

concentration for extended periods, to work in coordination with others, and to complete a

normal workday.  (Tr. 441-42).  With respect to social interaction, Dr. Cottone found Claimant to

be moderately limited in her ability to interact appropriately with the general public, to accept

instructions, and to get along with coworkers and peers.  (Tr. 442).  Dr. Cottone found Claimant

to be moderately limited in her ability to respond appropriately to changes in work setting and

ability to travel to unfamiliar places.  (Tr. 442).  Dr. Cottone opined that Claimant retains the

ability to ask simple questions, understand simple instructions, and carry out simple directions,

and minimal social contact would be beneficial.  Dr. Cottone determined Claimant would be able

to perform at least simple unskilled tasks.  (Tr. 442).  In the functional capacity assessment, Dr.

Cottone determined Claimant must avoid work involving intense or extensive interpersonal

interaction, handling complaints, or working in close proximity to coworkers.  (Tr. 443).  Further,

Dr. Cottone determined that Claimant can understand, remember, carry out, and persist at simple

to moderate tasks, make simple to moderate work-related judgments, relate adequately to coworkers or supervisors, and adjust adequately to ordinary changes in work routine or setting. (Tr. 443).

On November 10, 2008, Alison Burner, a counselor at St. Louis Psychological Services, completed a psychological evaluation on referral by Social Security Disability Determinations. (Tr.424). Claimant reported living with a friend and receiving a GED and an associate's degree and training as a CNA. Claimant last worked in December 2008 as a CNA, but she left the job due to her physical deterioration. (Tr. 424). Claimant reported that her mental health was excellent prior to her diagnosis of multiple sclerosis. (Tr. 425). Ms. Burner found Claimant's concentration and attention to be adequate. Claimant drove to the evaluation unaccompanied. (Tr. 426). With respect to activities of daily living, Claimant reported no longer being able to care for her daily needs adequately, and she needs help grocery shopping. Claimant is not able to do the laundry, cooking, or cleaning because of her pain, and is limited by her motivation and fatigue. Ms. Burner observed that Claimant cried throughout the evaluation. (Tr. 426). Ms. Burner opined that Claimant appears to have significant psychological symptomology which would negatively affect obtaining or maintaining employment, and her depression and anxiety would likely cause absenteeism. (Tr. 427). Ms. Burner included in her diagnosis major depressive disorder, generalized anxiety disorder, and panic disorder. (Tr. 427).

During treatment on November 20, 2008, Claimant reported to Dr. Ahmad being treated by a neurologist and being fatigued from her multiple sclerosis. (Tr. 421).

The November 21, 2008 CT pulmonary angiogram showed no acute pulmonary embolism. (Tr. 504). The chest x-ray showed no acute disease in her chest. (Tr. 505).

On November 26, 2008, Claimant reported chest pain and shortness of breath but both having now resolved. (Tr. 511). Claimant reported improvement of symptoms with symptoms being mild. Smoking is listed as one of Claimant's risk factors. The doctor noted no cardiac history, but Claimant has a history of anxiety. (Tr. 511). The doctor noted that Claimant had been tapering off steroids from multiple sclerosis flare up week earlier. (Tr. 512). An emergency room nurse observed Claimant to ambulate with a steady gait. (Tr. 516). The doctor listed tachycardia as Claimant's diagnosis and directed Claimant to receive follow-up treatment with her doctor. (Tr. 519).

In a follow-up visit on December 12, 2008, Claimant reported having a mild weakness in her left leg starting one month earlier. (Tr. 570). Dr. Sommerville started a four week Decadron taper, and this helped Claimant. Claimant reported feeling like she returned to baseline. Claimant complained of persistent pain in her left neck, shoulder, and trunk. Dr. Sommerville noted that Claimant developed gastreosophageal reflux disease ("GERD") symptoms and tachycardia for a time while on steroids, but Claimant did not inform him of her symptoms, and she sought treatment at her local emergency room. (Tr. 570). Dr. Sommerville observed Claimant's gait to be normal. (Tr. 571). Dr. Sommerville noted Claimant had a relapse last month and has some subtle new findings on examination with a trace of left arm weakness, but her left leg is stable. Dr. Sommerville noted that Claimant reported some new gait difficulties, but he observed her gait to be unchanged. Dr. Sommerville opined that Claimant might need to be on a stronger disease modifying agent for her multiple sclerosis given that Claimant has had two distinct myelitis episodes over the past eighteen months albeit relatively mild ones both affecting her left side. Dr. Sommerville ordered a MRI of Claimant's brain and cervical spine. (Tr. 571).

The January 19, 2009 MRI of Claimant's cervical spine showed no interval change in the T2 hyperintensity in the cervical spinal cord extending from C2 through C4. (Tr. 562-63). The MRI of her brain revealed an enhancement of a single left parietal lobe lesion, and the doctor opined this to be consistent with the progression of her demyelinating disorder. (Tr. 562-63).

On February 10, 2009, Dr. Becky Parks evaluated Claimant at the John L. Trotter Multiple Sclerosis Center at Barnes-Jewish Hospital. (Tr. 579). Dr. Parks noted that Claimant had a relapse in May 2007 and was treated with IV steroids with improvement. In November 2008 Claimant had another relapse. Claimant reported having excessive fatigue. Dr. Parks noted that Claimant has been treated with Rebif since 2005, but Claimant has missed numerous doses because of financial paperwork or forgetting. Claimant estimated missing almost half her doses in the last six months. Claimant denied any bothersome side effects of Rebif. Claimant reported finding an advocate at Caremark and so being able to obtain Rebif more regularly. (Tr. 579). Claimant reported smoking marijuana and trying to quit smoking. (Tr. 580). Dr. Parks observed her gait to be cautious and noted Claimant able to walk on her heels and on her toes, and her tandem gait to be unsteady. (Tr. 581). Dr. Parks reviewed the January 19 MRI results. (Tr. 582-83). Dr. Parks noted that although Claimant has had two exacerbations while on treatment with Rebif, Claimant estimated she had missed half of the Rebif doses. (Tr. 583). Claimant set up a reminder alarm on her phone to remind her to take all Rebif doses. (Tr. 583).

In a follow-up visit on March 6, 2009, Claimant reported since her last visit she has been stable with fixed, mild weakness of the distal left leg. (Tr. 554). Dr. Weiss noted that Claimant has had two clinical relapses over the past two years and had an enhanced brain lesion on recent MRI. (Tr. 556). Dr. Weiss decided to switch her medication regimen from Rebif to Copaxone

and noted Claimant might benefit from having an AFO. Dr. Weiss referred Claimant to Orthotic lab to have AFO refitted. (Tr. 556).

In a multiple sclerosis follow-up visit on May 12, 2009, Claimant reported problems walking. (Tr. 575). Claimant was first treated at the John Trotter Multiple Sclerosis Center at Barnes-Jewish Hospital in February 2009. Dr. Parks noted that Claimant had a high neutralizing antibody titer to beta-interferon so that her therapy was changed from Rebif to Copaxone. Dr. Parks noted Claimant to be experiencing significant depression inasmuch as she has barely left her house for the last month. Claimant takes Cymbalta and Mirtazapine as treatment. Claimant reported not doing any exercising or stretching because she was under the impression that physical activity was discouraged if you have multiple sclerosis. (Tr. 575). Claimant reported being fatigued. (Tr. 576). Cardiac examination showed regular rate and rhythm. (Tr. 576). Dr. Parks observed Claimant's gait to be abnormal due to her left foot being somewhat extended and opined that "[m]uch of her gait problem appears to be a learned, biomechanical abnormality." (Tr. 577). Dr. Parks had Claimant evaluated by a physical therapist who provided some home exercises. (Tr. 578).

During treatment on July 6, 2009, the doctor noted that Claimant was evaluated by a physical therapist and was given some home exercises. (Tr. 549).

During an annual health risk screening at Barnes Jewish Hospital on July 31, 2009, the treating nurse noted that with respect to functional abilities, Claimant has no difficulty walking, getting dressed, problems with falling, bathing/grooming, memory problems, speaking, or activities of daily living including cooking, cleaning, shopping and driving. (Tr. 536). Claimant reported attempting to quit smoking. (Tr. 536). Claimant reported no concerns with getting

medications and not experiencing pain. (Tr. 537). The nurse encouraged Claimant to stop smoking and provided smoking cessation resources. (Tr. 537). During a well woman visit, the doctor noted Claimant's multiple sclerosis' symptoms to be well controlled at that time and being managed by a neurologist. (Tr. 541). Claimant reported her symptoms of depression to be improved on current medication regimen. The doctor encouraged regular exercise such as aerobic walking. (Tr. 541).

## IV.    The ALJ's Decision

The ALJ found that Claimant meets the insured status requirements of the Social Security Act through December 31, 2011. (Tr. 12). Claimant has not engaged in substantial gainful activity since August 16, 2007, the alleged onset date. (Tr. 12). The ALJ found that the medical evidence establishes that Claimant has the severe impairments of major depressive disorder, anxiety disorder, panic disorder, multiple sclerosis, and degenerative disc disease of the spine, but no impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 12-13). The ALJ found that Claimant has the residual functional capacity to perform light work except

> the claimant can occasionally climb stairs and ramps, stoop, kneel, and crouch.
> The claimant can never climb ropes, ladders, scaffolds, or crawl. The claimant can
> understand, remember, and carry out at least simple instructions and non-detailed
> tasks. The claimant can maintain concentration and attention for 2 hour segments
> over an 8 hour period. The claimant is able to respond appropriately to
> supervisors and co-workers in a task-oriented setting where contact with others is
> casual and infrequent.

(Tr. 14). The ALJ determined that Claimant is unable to perform past relevant work. (Tr. 18). Claimant's birth date is November 19, 1962 and thus a younger individual on the alleged disability onset date. The ALJ noted Claimant has at least a high school education and is able to

communicate in English.  The ALJ opined that the transferability of jobs is not material to his determination inasmuch as the Medical-Vocational Rules supports a finding that Claimant is not disabled whether or not she has transferable job skills.  Considering Claimant's age, education, work experience, and residual functional capacity, the ALJ found there to be jobs that exist in significant numbers in the national economy that Claimant can perform.  (Tr. 18).  The ALJ found that Claimant was not under a disability from August 16, 2007, the alleged onset date, through the date of his decision.  (Tr. 19).

## V.     Discussion

In a  disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability.  <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001).  Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).  Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); <u>see</u> <u>also</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled.  First, the ALJ must determine whether the individual is engaged in "substantial gainful activity."  If she is, then she is not eligible for

disability benefits. 20 C.F.R. § 404. 1520(b). If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant is not found to have a severe impairment, she is not eligible for disability benefits. If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, she is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will she be found disabled. 20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274 F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Id. The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts

from that decision." <u>Beckley v. Apfel</u>, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to support his findings, regardless of whether substantial evidence exists to support a different conclusion. <u>Haley v. Massanari</u>, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative record and consider:

1.     The credibility findings made by the ALJ.

2.     The claimant's vocational factors.

3.     The medical evidence from treating and consulting physicians.

4.     The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.

5.     Any corroboration by third parties of the claimant's impairments.

6.     The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

<u>Stewart v. Secretary of Health & Human Servs.</u>, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting <u>Cruse v. Bowen</u>, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "if it is supported by substantial evidence on the record as a whole." <u>Wiese v. Astrue</u>, 552 F.3d 728, 730 (8th Cir. 2009) (quoting <u>Finch v. Astrue</u>, 547 F.3d 933, 935 (8th Cir. 2008). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." <u>Wiese</u>, 552 F.3d at 730 (quoting <u>Eichelberger v. Barnhart</u>, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the

record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision.  Id.  The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, Dunahoo v. Apfel, 241 F.3d 1033, 1037 (8th Cir. 2001), or it might have "come to a different conclusion." Wiese, 552 F.3d at 730.  Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." Wheeler v. Apfel, 224 F.3d 891, 894-95 (8th Cir. 2000).  See also Owen v. Astrue, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

Claimant argues that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ failed to properly consider the opinion evidence of Dr. Sommerville and failed to consider Listing 11.00D.  Next, Claimant contends that the ALJ failed to consider Claimant's fatigue to be a severe medically determinable impairment.

A.   Weight Given to Treating Doctor's Opinion of November 10, 2006

Claimant contends that the ALJ failed to properly consider the opinion evidence of Dr. Sommerville dated November 10, 2006.

"A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. §404.1527(d)(2) (alteration in original).  "[W]hile a treating physician's opinion is generally entitled to substantial weight, such an opinion does not

automatically control because the [ALJ] must evaluate the record as a whole." Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007) (internal quotations omitted). Thus, "'an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained within the record.'" Id. (quoting Prosch v. Apfel, 201 F.3d 1010, 1013-14 (8th Cir. 2000)).

A treating physician's opinion may be, but is not automatically, entitled to controlling weight. 20 C.F.R. § 404.1527(d)(2). Controlling weight may not be given unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques. SSR 96-2P, 1996 WL 374188 (July 2, 1996). Even a well-supported medical opinion will not be given controlling weight if it is inconsistent with other substantial evidence in the record. Id. "The record must be evaluated as a whole to determine whether the treating physician's opinion should control." Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009). When a treating physician's opinions "are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight." Halverson v. Astrue, 600 F.3d 922, 930 (8th Cir. 2010( (quoting Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002)). "A treating physician's opinion does not automatically control, since the record must be evaluated as a whole." Perkins v. Astrue, 2011 WL 3477199, *2 (8th Cir. 2011) (quoting Medhaug v. Astrue, 578 F.3d 805, 815 (8th Cir. 2009)). The ALJ is charged with the responsibility of resolving conflicts among the medical opinions. Finch v. Astrue, 547 F.3d 933, 936 (8th Cir. 2008).

In a November 10, 2006 Supplemental Attending Physician Statement, Dr. Sommerville noted that Claimant stopped working in 2005 because of her condition, but he did not advise her to cease working. Dr. Sommerville confirmed Claimant's diagnosis of multiple sclerosis and

listed hyperflexia of Claimant's right leg as his objective findings and indicated that Claimant had not been hospitalized. Dr. Sommerville opined that Claimant could sit for four hours and stand and walk for an hour in an eight hour workday. Dr. Sommerville further opined that Claimant could frequently perform fine finger movements, hand-eye coordinated movements, and pushing/pulling. Dr. Sommerville noted that he expected improvement in Claimant's capabilities in three to six months, and Claimant had no restrictions on activities or limitations on activities.

Claimant contends that inasmuch as Dr. Sommerville found Claimant could work a total of six hours instead of eight hours, Claimant is not capable of competitive employment and in support, cited the vocational expert's testimony regarding the need of a person being able to work eight hours a day in order to be capable of competitive employment.

First, the undersigned notes that the medical source opinion cited by Claimant was completed almost one year prior to Claimant's alleged disability onset date and during a clinical relapse of her multiple sclerosis. Likewise, Dr. Sommerville opined that he expected improvement in Claimant's capabilities in three to six months and placed no restrictions or limitations on her activities. Indeed, the medical record reflects that Claimant has not reported right sided weakness since August 22, 2008 and her strength to be consistently 5/5 on the right side and only slightly reduced on the left and her gait for the most part to be normal. During an annual health risk screening at Barnes Jewish Hospital on July 31, 2009, Claimant reported that with respect to functional abilities, she has no difficulty walking, getting dressed, problems with falling, memory problems, speaking, or activities of daily living including cooking, cleaning, shopping and driving. Claimant also reported not experiencing pain.

The ALJ acknowledged that Dr. Sommerville was a treating source, but that his opinion of

November 10, 2006 was not entitled to controlling weight, because it was inconsistent with his prescribed medical treatment. See Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007) ("If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight."). Likewise, Dr. Sommerville's opinion is inconsistent with his own treatment notes. Davidson v. Astrue, 578 F.3d 838, 842 (8th Cir. 2009) ("It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes."). An ALJ may "discount or even disregard the opinion of a treating physician ... where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000); Hackler v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight is not given to the RFC assessment). Indeed, in his treatment notes Dr. Sommerville never set forth any specific limitations on physical activity. Dr. Sommerville's treatment notes do not reflect the degree of limitation he noted in his November 10, 2006 opinion. As noted by the ALJ, Dr. Sommerville's opinion is set forth in a form submitted to Claimant's long term disability company, not in any of his treatment notes. The undersigned concludes that the ALJ did not err in affording little weight to Dr. Sommerville's opinion of November 10, 2006.

This is a difficult case inasmuch as Claimant has been diagnosed with a serious, progressive relapsing and remitting illness. See Young v. Apfel, 221 F.3d 1065, 1068 n.3 (8th Cir. 2000) (defining multiple sclerosis and citing Sloane-Dorland Annotated Medical-Legal Dictionary 632-33 (1987, supp. at 470-71 (1992)). The ultimate issue in this case is how severe Claimant's multiple sclerosis symptoms were during the relevant time period. Claimant's

subjective complaints of severe disabling pain in her arms and legs and inability to work because of extreme fatigue but her objective findings never indicated such severity. The ALJ noted that although Claimant reported decreased strength and weakness, examination showed strength in her lower left extremity and upper left extremity to be stable with a slight loss of strength and strength in her right lower and upper extremities to be at full strength. The ALJ noted that on occasion Claimant's gait has been observed to be abnormal, and one doctor observed that "[m]uch of her gait problem appears to be a learned, biomechanical abnormality." (Tr. 577).

Next, Claimant also contends that the ALJ failed to consider Listing 11.00D by not considering the frequency and duration of exacerbations, length of remissions, and permanent residuals. 20 C.F.R. Subpart P, App. 1, Section 11.00D. "Most cases of MS involve intermittent periods of symptoms and signs (exacerbation) followed by a period of improvement (remission). Excerbations [*sic*] vary in frequency, duration, character and severity. Remissions similiary vary in duration and in the extent of improvement." <u>See</u> Program Operations Manual System ("POMS") DI 24580.015 Evaluation of Multiple Sclerosis (MS).

In considering a case involving multiple sclerosis,

Courts have long recognized that multiple sclerosis is a progressive disease for which there is no cure and which is subject to periods of remission and exacerbation. While multiple sclerosis is not per se disabling, the ALJ in evaluating a claimant with MS must consider "the frequency and duration of the exacerbations, the length of remissions, and the evidence of any permanent disabilities." Since at least 1984, the Social Security regulations have recognized that '[i]n conditions which are episodic in character, such as multiple sclerosis ... consideration should be given to frequency and duration of exacerbations, length of remissions, and permanent residuals." 20 C.F.R. Ch. III, Pt. 404, Subpt. P, App. 1, § 11.00(D). Thus, "[w]hen a claimant with multiple sclerosis applies for social security benefits, it is error to focus on periods of remission form the disease to determine whether the claimant has the ability to engage in substantial gainful employment."

<u>Tyser v. Astrue</u>, 2010 WL 2541255, at *10 (D.Neb. 2010)(internal citations omitted).  As noted by the ALJ, the treatment notes show as of March 2009, Claimant has suffered two relatively mild clinical relapses of multiple sclerosis over the last two years with an enhancing brain lesion, and once Claimant's medications were changed, no treatment notes reflect a relapse.[2]  "Impairments that are controllable or amendable to treatment do not support a finding of disability, and '[f]ailure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits.'"  <u>Kisling v. Chater</u>, 105 F.3d 1255, 1257 (8th Cir. 1997) (quoting <u>Roth v. Shalala</u>, 45 F.3d 279, 282 (8th Cir. 1995)).  Indeed, the treatment notes are devoid of any restrictions being placed on Claimant by any treating doctor since her alleged onset date of disability.  Instead, the records show the doctors have encouraged Claimant to get regular physical exercise and to stretch and use her limbs.  Further, the medical records  generally show that Claimant was not in acute distress, had good cognitive abilities, full strength, and ambulated without assistive devices.

Claimant also contends that the ALJ was obligated to re-contact Dr. Sommerville.  First, the undersigned notes that the ALJ only give little weight to Dr. Sommerville's opinion set forth in a form completed on November 10, 2006, not all of his medical records.  The ALJ had a clear understanding of Dr. Sommerville's opinion as expressed in the November 10, 2006 form, and decided to give the opinion little weight in light of the date, its contents, and other facts in the record.  "An ALJ should recontact a treating or consulting physician if a critical issue is undeveloped."  <u>Martise v. Astrue</u>, 641 F.3d 999, 926 (8th Cir. 2011).  However, a lack of medical evidence to support a doctor's opinion does not equate to underdevelopment of the record as to a

---

[2]The undersigned notes that Claimant reported missing half of the Rebif doses in the period of the two exacerbations.

claimant's disability.  Id. at 927.  The duty to re-contact a treating physician for clarification of an opinion arises only if a crucial issue is undeveloped.  Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005).  Thus, the ALJ did not err in failing to recontact Dr. Sommerville.

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole.  Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently.  Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001).  Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

B.     Fatigue as a Medically Determinable Impairment

Claimant contends that the ALJ failed to consider Claimant's fatigue to be a severe medically determinable impairment.

To show an impairment is severe, a claimant must show that she has a (1) medically determinable impairment or combination of impairments which (2) significantly limits her physical or mental ability to perform basic work activities without regard to age, education, or work experience.  See  20 C.F.R. §§ 404.1520(c). 404.1521(a), §§ 416.920(c), 416.921(a).  "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities."  Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007).  In other words, if it is not medically determinable or has no more than a minimal effect on the plaintiff's ability to work.  Nguyen v. Chater, 75 F.3d 429, 431 (8th Cir. 1996).

Fatigue is a symptom of multiple sclerosis and should be addressed by the ALJ.  The ALJ

discussed fatigue as a symptom of depression and multiple sclerosis and found Claimant's fatigue not to be a severe medically determinable impairment. The undersigned finds that substantial medical evidence supports this determination.

Here, the ALJ's determination that Claimant's fatigue is not a severe impairment is supported by substantial evidence in the record. The ALJ rejected Claimant's claim of severe impairment by specifically referencing an entry by Dr. Sommerville encouraging Claimant to exercise on a regular basis, maintain a good sleep schedule, and good nutrition to help control her fatigue. The ALJ correctly relied on this medical evidence inasmuch as the subsequent medical visits showed Claimant failed to follow the doctor's recommendations regarding exercising on a regular basis. The ALJ discussed Claimant's fatigue throughout the opinion as a symptom of multiple sclerosis and depression and noted how treating sources also characterized her fatigue as a symptom of multiple sclerosis and depression throughout the treatment records. Likewise, the ALJ took Claimant's fatigue into account in formulating her residual functional capacity by including a limitation of light work and a requirement that Claimant maintain concentration and attention for no more that two hours at a time.

Although Claimant was diagnosed with depression and was prescribed medications, Claimant did not allege depression as disabling in her applications. The fact that Claimant did not allege depression in her applications for disability benefits is significant, even though some evidence of depression was later developed. See Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001) (failure to allege disabling mental impairment in application is significant, even if evidence of depression was later developed). The ALJ found Claimant's major depressive disorder to be a severe impairment, but he noted that Claimant sought only minimal and

conservative treatment. See Craig v. Chater, 943 F.Supp. 1184, 1189 (W.D. Mo. 1996) ("Allegations of a disabling impairment may be properly discounted because of inconsistencies such as minimal or conservative medical treatment."). The ALJ noted that Dr. Ahmad treated Claimant for several years, and his intake notes show that his treatment largely consisted of prescribing medications. See Kirby v. Astrue, 500 F.3d 705, 707-09 (8th Cir. 2007) (impairment is not severe if it is only slight abnormality that would not significantly limit mental ability to do basis work activities; claimant bears the burden of establishing impairment's severity). The ALJ found that Claimant's mental impairments restricted her to understanding, remembering, and carrying out at least simple instructions, and non-detailed tasks; maintaining concentration and attention for two-hour segments over an eight hour period; and a task-oriented work setting with only casual and infrequent contact with others.

The undersigned recognizes that Claimant's multiple sclerosis is a progressive disorder which may (or may already have) become a disability entitling her to benefits, as of some yet-to-be-determined date subsequent to August 16, 2007. However, the ALJ's finding that Claimant was not under a disability, as defined in the Social Security Act, from August 16, 2007 through April 16, 2010, was supported by substantial evidence in the record.

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be affirmed.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

Dated this __5th__ day of July, 2012.

_____/s/ Terry I. Adelman_____
UNITED STATES MAGISTRATE JUDGE